IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| UNITED STATES OF AMERICA, Plaintiff, vs. BP EXPLORATION (ALASKA) INC., Defendant. | Case No. 3:07-cr-0125-RRB <u>**DECISION AND ORDER**</u> |
|---|---|

## I. INTRODUCTION

Before the Court is an Amended Petition for Probation Violation filed against BP Exploration (Alaska) Inc., alleging two probation violations arising from an oil spill that occurred on November 29, 2009, in the Western Operating Area of Prudhoe Bay, Alaska. At the time, BP was on probation as a result of a misdemeanor conviction in United States District Court in November of 2007 for violation of the Clean Water Act. The Government alleges that BP violated the condition of probation that it "shall not commit another federal, state, or local crime" when it negligently permitted the discharge of pollutants onto state land and federal waters. BP denies negligence and denies that pollutants were discharged into federal waters.

DECISION AND ORDER - 1
3:07-CR-0125-RRB

The Government carries the burden of proof in this matter and must establish violations by a preponderance of the evidence pursuant to 18 U.S.C. § 3583(e)(3), although the usual rules of evidence need not be applied.[1]

An evidentiary hearing was held on November 29, November 30, December 1, December 2, December 5, December 6, and December 7, 2011, at which both the Government and BP presented witnesses. The parties generally agree with regard to the facts surrounding the November 29, 2009, incident. The facts, therefore, will not be recited here. The parties disagree with regard to whether sufficient evidence of negligence exists to constitute a violation of either state law or the Clean Water Act, and hence, a violation of probation.

The Court notes initially, from a review of all of the relevant evidence, including the opinion expressed by Agent Goers as a result of his interviews with BP employees, that had BP known about the blockage in the 18 inch pipeline in question, it would have very likely acted to address and resolve the problem before the rupture occurred. The initial question presented, therefore, is whether, under the circumstances, BP should or could have reasonably known of the blockage earlier than it did. The parties disagree vehemently

---

[1] Morrissey v. Brewer, 408 U.S. 471 (1972)

on this point, as do their respective experts. The Government contends that better positioning and monitoring of the temperature sensor on the 18 inch oil pipeline that burst would have alerted BP of the problem beforehand. The Government further alleges that the BP alarm system in general was inadequate, mis-managed, and not consistent with industry standards, and the plant operators at the Lisburne Plant Center (LPC) were not properly trained. The Government also suggests that BP should have had a flow monitor of some sort on the 18 inch L-3 line which would have alerted BP of the blockage.

    BP responds that the temperature sensors on L-3 were not for flow monitoring and were never intended nor used for that purpose. The sensors were initially installed in 1993 to address "slugging" problems in the common lines before the lines were looped. Therefore, it would not have mattered whether the temperature sensor was located inside or outside the LPC building. There had never been a freezing problem or an unplanned stoppage with the L-3 line from the time it was installed in 1986 until the 2009 incident. As a result, BP contends that it had no reason to expect the freeze up in 2009. Further, because the oil received at the LPC was consistent with that being sent from the well sites, and there was no significant change in pressure in the line, BP contends that there was nothing to indicate to either the board operators at the LPC or

to the well site operators that there was an interruption in flow in the L-3 line. BP contends that in 2009 there was not a statute, a regulation, or an industry practice that required a flow monitor or heat sensors on the pipelines in question. Moreover, BP contends that flow monitors on common lines are not practical and none exist at any of the other facilities on the North Slope. With regard to BP's alarms, BP contends that its system was consistent with industry standards and worked as intended.

BP witnesses uniformly testified that the LPC site was conducted and maintained consistent with industry practices and standards at the time of this incident and that the actions taken after the blockage was detected were completely reasonable and appropriate. They take issue with the criticism of the Government's expert who had not visited the site nor worked in a facility like the LPC.

In response to the challenge by the Government's expert regarding the training of BP personnel, BP points to the extensive training of its operators, the training manuals utilized by BP, and the 24 hour-a-day presence of engineers on site. In this regard, the Court notes that the BP employees who testified concerning plant operations appeared to be well qualified and knowledgeable with regard to pipeline operations. They were candid in their testimony and sincere with regard to their concern that the LPC be safe and

efficient. BP employs roughly 250 engineers in Alaska and, according to BP witnesses, was very well staffed with engineering expertise at the time of this incident.

Process Hazard Analysis (PHA) are studies conducted routinely by BP which comply with OCEA regulations to ensure that pipeline operations are appropriate. Just prior to this incident, in February of 2009, a PHA was conducted on the pipelines between the drill sites and the LPC where this incident occurred. The PHA concluded that there was no credible scenario by which a low flow condition could occur on the L-3 line so long as the wells were producing. Further, the PHA concluded that even if a low flow condition were to occur, there would not likely be a serious consequence (NSCI) (no serious consequence identified), for there was no historical reason to believe that a freeze up in an 18 inch common line would lead to a rupture of the pipeline. The persons who conducted this PHA appear to have been well qualified and sincere in their views. This leads the Court to conclude that well qualified engineers simply did not anticipate the problem that ultimately developed.

The Government further contends that BP failed to timely and properly respond to the discovery of the ice plug in the line during the 15 days between the discovery of the no-flow condition on November 14, 2009, and the rupture of the line on November 29, 2009, and failed to take adequate steps to thaw the line.

Defendant responds that it began immediately to consider the best and safest course of action and cannot be faulted for taking the time to prepare a risk assessment. Although BP was intending to thaw the frozen L-3 line at the time it burst, it notes that a previous freeze up of the L-2 line was ultimately resolved by allowing the pipe to thaw with the warmer season without any danger or damaging results. BP contends that it had no reason to believe that a different result would occur if the frozen L-3 line was allowed to thaw in a similar fashion.

In 2001 a freeze up occurred on a 6 inch line at D-Pad which the Government contends should have put BP on notice of the possibility of a freeze up in the D-3 line. BP responds that the two lines were substantially different and demonstrated for the Court the ten-fold difference in size between the two lines. Moreover, BP notes that the circumstances leading to the D-Pad rupture were totally different and the corrections ultimately suggested in 2001 were unique to D-Pad and aimed solely at the D-Pad incident. The D-Pad line froze due to a mechanical failure when a value accidently closed and did not occur due to an unexplained slow down or stoppage of flow as was the case at L-3.

Another dispute raised in this litigation concerns the jurisdiction of the Clean Water Act and whether or not the spill site, which was south of a gravel road separating the spill site

from Prudhoe Bay, occurred on waters of the Unities States. The Government argues that the spill site was, in fact, jurisdictional because, among other things:

    1.    The wetlands on which the spill occurred were contiguous to or adjacent to various bodies of navigable water, including East Lake, East Stream, and West Stream;

    2.    The wetlands on both sides of the gravel road constituted one continuous body of wetlands, crossed by a road, which were connected by culverts and active hydrology; and

    3.    There was a significant nexus between the wetlands at the spill site and other surrounding navigable waters. The Government is unaware of any circumstances where a road alone, especially one with culverts, cut off wetland jurisdiction.

BP argues that the wetlands on which the spill occurred were adjacent to wetlands but not adjacent to a navigable waterway and, thus, not within Clean Water Act jurisdiction. BP argues that the roadway in question created two separate wetland bodies, one jurisdictional and one not. BP argues that there is no wetland jurisdiction for the spill site pursuant to this Court's conclusions in <u>Great Northwest, Inc. v. United Sates Army Corps of Engineers</u>, 4:09-cv-0029-RRB.

Both parties presented well qualified experts who testified extensively with regard to these matters and the vagaries of the

DECISION AND ORDER - 7
3:07-CR-0125-RRB

Case 3:07-cr-00125-RRB   Document 71   Filed 12/27/11   Page 7 of 13

Clean Water Act, with each reaching a different conclusion as to whether or not the area on which the spill occurred was jurisdictional.

## II. CONCLUSION

### A. Violation I

After considering all of the relevant evidence presented at the evidentiary hearing conducted in this matter, the Court concludes that the Government has failed to establish by a preponderance of the evidence that BP committed criminal negligence as defined in Alaska Statue 11.81.900(a)(4). While the Court would prefer a failsafe system where accidents never happen, it recognizes that human beings and engineering practices are not perfect and that, on occasion, unexpected or unanticipated accidents can and will happen. Certainly, in retrospect, things could have been done differently that may, or may not, have prevented this spill. But in the instant case, the Court concludes, based on the evidence presented, that BP was following accepted industry practices at all relevant times and could not have reasonably expected a blowout similar to the one that occurred on November 29, 2009. Further, the Court concludes that once the freeze up was discovered, BP acted reasonably in addressing the problem.

Moreover, although not determinative here, once the spill occurred, BP acted quickly and responsibly and without regard to

cost in cleaning up the spill before extensive damage occurred. During the course of the hearing, numerous photographs and videos of the spill site were introduced into evidence indicating both the flow patterns of surface waters at or near the spill site and also demonstrating the significant restoration that quickly took place at and around the spill site. An untrained observer would likely be unable to find any indication that a spill had occurred. The restoration efforts were impressive and indicate that every reasonable effort was taken to restore the land to its pre-spill condition. Moreover, there was no evidence presented to indicate that any contaminants reached Prudhoe Bay or any of the nearby lakes as a result of the spill.

**B. Violation II**

While the Court accepts some of BP's argument with regard to the Clean Water Act, jurisdiction, under the unique facts of this case, likely would apply here, for it appears that at least a portion of the oil spill (the oil plume) impacted the wetlands north of the road, albeit minimally. Nevertheless, the Court again concludes that BP's conduct at the time of the 2009 incident was not negligent given the state of knowledge that existed at the time of the November 2009 incident. For over 24 years the L-3 pipeline in question was used without incident or freeze up and for roughly 14 years L-3 was used as part of a looped line system that was

DECISION AND ORDER - 9
3:07-CR-0125-RRB

established in 1995 when ARCO operated the pipeline. There was no evidence presented that operators working for either ARCO or BP had a reasonable expectation that a freeze up was a possibility in the L-3 line. Nor were witnesses called from others in the industry who actually worked in the field to show that industry standards were violated. Of great significance in this matter is the absence of any evidence to suggest that a flow monitor on the L-3 common line was required by industry standards, was used by other companies in similar climates, or was practical in 2009. While the industry is studying flow monitors, they currently are not used throughout the industry. This, on top of the lack of evidence that industry standards would require a temperature sensor for the purpose of monitoring oil flow in a common line, leads the Court to conclude that BP was in compliance with industry standards with regard to the L-3 line at the time of the November 2009 accident. The Court re-listened to a portion of the testimony of the Government's expert, Dr. Jan Windhorst, PE, who has not visited the LPC and has no experience with similar facilities. The Court cannot find that he provided credible evidence to suggest a violation of industry standards was a cause of this incident.

    Finally, with regard to the alarm system utilized by BP, there is no evidence that it violated industry standards or was inferior to that used at other facilities on the North Slope. Nor is there

DECISION AND ORDER - 10
3:07-CR-0125-RRB

Case 3:07-cr-00125-RRB   Document 71   Filed 12/27/11   Page 10 of 13

any evidence that any alarms were missed regarding the L-3 line at the time of this incident due to "alarm flooding" or lack of personnel. The board operators, based on years of experience, simply did not regard the low temperature alarm on L-3 as indicative of a reduced flow or blockage of the line. In hindsight, this was a mistake, but it was not unreasonable based on the state of the industry at the time of the 2009 spill. The Court, therefore, cannot conclude, by a preponderance of the evidence, that BP's conduct leading up to and including the November 2009 incident was below the standard of conduct a reasonably prudent and careful company would have employed or that the pipeline freeze up was a foreseeable result of the conduct complained of.

### III. SUMMATION AND ORDER

The Court notes that subsequent to the November 29, 2009, incident, BP conducted an extensive, thorough, and open investigation into the causes of the spill. The report that this generated was shared with the Government and was available to the Court and parties at the evidentiary hearing. This openness is encouraged and is crucial as private industry and government work together to ensure the safe, responsible, and lawful development of natural resources.

The investigation concluded, based on the metallurgy report, that the pipeline rupture was not caused by corrosion or improper

DECISION AND ORDER - 11
3:07-CR-0125-RRB

Case 3:07-cr-00125-RRB   Document 71   Filed 12/27/11   Page 11 of 13

maintenance, but was caused by a sequence of circumstances, including cooling and warming of ambient temperature after the flow stopped, which led to the freezing of both water and hydrates. This ultimately resulted in increased gas pressure within the pipeline that caused the rupture. Why the flow slowed initially remains a mystery to all.

The Court certainly cannot fault the Government for the position it has taken in this matter for there clearly were reasons for concern. There can be no doubt that the Government takes its responsibility seriously to monitor the industry and to ensure compliance with environmental laws. While this entire endeavor has been costly for all involved, it has been worthwhile if only to demonstrate the high regard society places on the environment as the nation's natural resources are harvested.

For the reasons expressed above, the Court concludes that BP did not violate the terms of probation at the time of, leading up to, or subsequent to the 2009 oil spill. In the future, however, if a similar freeze up and spill were to occur under similar circumstances, the Court would view the entire matter differently. BP is now clearly on notice of the potential that a freeze up could occur within an 18 inch common line that is part of a looped line system and that a freeze up could cause the pipe to burst. It is incumbent upon BP to make sure this does not happen again.

THEREFORE, the Petition is **DISMISSED** and BP is released from probation.

**IT IS SO ORDERED.**

ENTERED this 27th day of December, 2011.

                                            S/RALPH R. BEISTLINE
                                            UNITED STATES DISTRICT JUDGE